2005 UT 63

Paul HOUGHTON and Billie Henderson, individually and each as representative of a class; and Damian Henderson, Wayne Rubens, Ron Roes, and Susan Roes, who are other members of these classes, similarly situated, Plaintiffs and Appellants,

v.

DEPARTMENT OF HEALTH; The Office of Recovery Services; The Department of Human Services; The State of Utah; Rod L. Betit, Director of the Department of Health and Director of Department of Human Services; Emma Chacone, Executive Director of the Office of Recovery Services; and John Does 1–50 and Jane Does 1–50, Defendants and Appellees.

No. 20030931.

Supreme Court of Utah.

Sept. 27, 2005.

Rehearing Denied Nov. 7, 2005.

See also 962 P.2d 58.

Robert B. Sykes, Alyson Carter, Robert J. Fuller, Salt Lake City, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., Brent A. Burnett, Asst. Att'y Gen., Salt Lake City, for defendants.

PARRISH, Justice:

¶ 1 In 1995, plaintiffs filed suit against the Department of Health, the Office of Recovery Services, the State of Utah, and individual defendants (collectively, the "State"), seeking the return of monies paid to the State from settlements or judgments entered on plaintiffs' behalf. After several years of protracted motion practice and two appeals to this court, plaintiffs now appeal the district court's interlocutory order limiting the scope of discovery. The district court based its

order on its interpretation of Utah case law. Because we conclude that the district court erred in its interpretation, we reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 As a result of injuries they sustained in separate accidents, plaintiffs Paul Houghton, Billie and Damien Henderson, and Wayne Rubens each received Medicaid assistance to pay their medical bills. After plaintiffs sought compensation for their injuries from potentially liable third parties, the State, pursuant to section 26–19–5 of the Utah Code (the "lien statute"),[1] placed reimbursement liens on any settlement or judgment proceeds in order to recover the Medicaid assistance it had paid on plaintiffs' behalf.

¶ 3 Alleging that the lien statute violated federal law, plaintiffs filed a notice of claim with the State pursuant to the provisions of the Utah Governmental Immunity Act (the "Immunity Act").[2] The notice stated that plaintiffs "intend[ed] to bring a class action" to recover "the money [the State] took illegally by liening their property ... plus any interest, costs and attorneys fees." Plaintiffs attached to their notice a draft complaint, which sought the return of all "monies ...

illegally and unlawfully taken" and "attorneys fees as allowed by law."

¶ 4 On October 27, 1995, plaintiffs filed suit against the State, alleging that the lien statute was illegal because it violated federal law prohibiting the filing of liens against the property of living Medicaid recipients. On December 18, 1995, plaintiffs moved to certify their suit as a class action, and on January 29, 1996, the district court granted the motion, certifying two classes of plaintiffs. Class I consisted of Medicaid recipients with third-party liability claims who received settlements or judgments from liable third parties from which the State's reimbursement liens were paid. Class II plaintiffs were identical to Class I plaintiffs with the exception that Class II plaintiffs had "retained counsel and actually filed actions or made claims through attorneys[ ] against the liable third parties."

¶ 5 After plaintiffs filed a notice of deposition and request for document production, the State moved to disqualify plaintiffs' attorneys, asserting that their representation of plaintiffs gave rise to a conflict of interest in violation of rule 1.9 of the Utah Rules of Professional Conduct because plaintiffs' attorneys had previously represented the State in personal injury actions brought by Medicaid recipients. In addition, the State sought

1. At all times relevant to this action, subsection (1) of section 26–19–5 provided:
   (1) (a) When the department provides or becomes obligated to provide medical assistance to a recipient because of an injury, disease, or disability that a third party is obligated to pay for, the department may recover the medical assistance directly from that third party.
   (b) The department's claim to recover medical assistance provided as a result of the injury, disease, or disability is a lien against any proceeds payable to or on behalf of the recipient by that third party. This lien has priority over all other claims to the proceeds, except claims for attorney's fees and costs authorized under Subsection 26–19–7(4).
   Utah Code Ann. § 26–19–5(1) (1998).
   This subsection was amended in 2004 and now reads as follows:
   (1) (a) When the department provides or becomes obligated to provide medical assistance to a recipient that a third party is obligated to pay for, the department may recover the medical assistance directly from that third party.
   (b) Any claim arising under Subsection (1)(a) or Section 26–19–4.5 to recover medical

assistance provided to a recipient is a lien against any proceeds payable to or on behalf of the recipient by that third party. This lien has priority over all other claims to the proceeds, except claims for attorney's fees and costs authorized under Subsection 26–19–7(4).
   *Id.* § 26–19–5(1) (Supp.2004). Because the 1998 version of section 26–19–5 was applicable at all times relevant to this action, all subsequent references to this section are to the 1998 version.

2. In 2004, the Utah Legislature repealed the Utah Governmental Immunity Act, sections 63–30–1 to –38, enacting in its place sections 63–30d–101 to –904. Act of Mar. 3, 2004, ch. 267, 2004 Utah Laws 1171. In so doing, the legislature acknowledged its intent that all "injuries alleged to be caused by a governmental entity that occurred before July 1, 2004, be governed by the provisions" of the former Act. *Id.* § 48, at 1215. Because the injuries alleged by plaintiffs in this case occurred prior to July 1, 2004, the former Act governs and all references in this opinion are to that Act.

a protective order to delay discovery pending the resolution of its motion to disqualify. The district court granted both motions. Plaintiffs petitioned this court for permission to file an interlocutory appeal, which we granted. In that appeal, we reversed the district court, holding that plaintiffs' counsel did not violate rule 1.9 of the Utah Rules of Professional Conduct. *Houghton v. Dep't of Health*, 962 P.2d 58, 63 (Utah 1998). On remand, the district court reinstated plaintiffs' counsel.

¶ 6 In late 1998, this court issued two opinions affirming the validity of the lien statute. *See S.S. v. State*, 972 P.2d 439, 442 (Utah 1998); *Wallace v. Estate of Jackson*, 972 P.2d 446, 448 (Utah 1998). Arguing that those opinions completely disposed of plaintiffs' claims, the State moved for judgment on the pleadings. While plaintiffs conceded that *S.S.* and *Wallace* gutted their challenge to the validity of the lien statute, they maintained the viability of their other claims. The district court granted the State's motion for judgment on the pleadings on all of plaintiffs' claims except their claim seeking the State's contribution to their attorney fees.

¶ 7 Undeterred, the State filed another motion directed at plaintiffs' claim for attorney fees. The State argued that it was entitled to summary judgment on that claim because the named plaintiffs either never incurred attorney fees or already had been compensated by the State for its share of fees. Plaintiffs opposed the State's motion and also sought reconsideration of the district court's ruling disposing of their other claims. Plaintiffs argued that, in addition to their claim for attorney fees, they should be allowed to proceed with their claim seeking to invalidate the priority status of the State's lien.

¶ 8 The district court disposed of both motions in an order dated November 13, 2000. It denied plaintiffs' motion for reconsideration, citing this court's decision in *State ex rel. Office of Recovery Services v. McCoy*, 2000 UT 39, 999 P.2d 572, and it granted the State's motion for summary judgment, declaring that "no issues related to a named plaintiff or class representative remain unresolved."

¶ 9 Plaintiffs again appealed to this court, arguing that the district court erred in (1) granting the State's motion for judgment on the pleadings with respect to their claim challenging the validity of the lien's priority status, and (2) granting the State's motion for summary judgment on the Class II plaintiffs' claims for attorney fees.

¶ 10 In *Houghton v. Department of Health*, 2002 UT 101, 57 P.3d 1067, we affirmed the district court's grant of judgment on the pleadings, holding that "the priority lien on Medicaid recipients' third-party settlement proceeds did not violate federal law." *Id.* ¶ 9. However, we reversed the summary judgment on the Class II plaintiffs' claim for attorney fees and remanded the case to the district court for further proceedings on that claim. *Id.* ¶ 10.

¶ 11 On remand, the Class II plaintiffs moved to compel discovery. Again, the State fired up its motion machine. It moved to dismiss without prejudice the Class II plaintiffs' remaining claim for attorney fees, arguing that the district court lacked subject matter jurisdiction over that claim because plaintiffs had failed to comply with the Immunity Act. In the alternative, the State argued that the district court should compel plaintiffs to add a new Class II representative because none of the named representatives could assert a valid claim for attorney fees. The State also moved to stay all discovery pending the district court's resolution of its motion to dismiss, which the district court denied. Thereafter, plaintiffs moved to add additional Class II representatives, and the State responded by filing an additional motion to dismiss. The State asserted that the district court lacked jurisdiction over those additional plaintiffs sought to be named as Class II representatives, as well as all other unnamed Class II plaintiffs, because the notice of claim filed with the State had not specifically listed them. Additionally, the State moved for a protective order, arguing that plaintiffs' discovery requests were overly broad and unduly burdensome, and sought protected information. The district court granted plaintiffs' motion to add Class II representatives and denied the State's mo-

tions to dismiss. The State then moved to decertify the class.

¶ 12 On November 3, 2003, in an order disposing of the remaining motions before it, the district court (1) denied plaintiffs' motion to compel discovery, (2) granted the State's motion for a protective order, limiting the discovery that plaintiffs could seek, and (3) delayed a decision on the State's motion for decertification of the class until after the parties completed the discovery allowed under the terms of the protective order.

¶ 13 The district court based its November 3, 2003 order on the holding of *McCoy*, which, it declared, "is found in the last sentence of paragraph 18 of that case." That sentence reads:

> We therefore conclude that under subsection (4), when the State elects to recover directly from a recipient who has expressly excluded the State's claim from any attempt to recover from a third party, the State must pay the attorney fees incurred in procuring the State's share of the settlement proceeds.

*McCoy*, 2000 UT 39, ¶ 18, 999 P.2d 572. The district court accordingly limited the scope of discovery to that which was necessary to identify Medicaid recipients falling within its interpretation of the holding of *McCoy*. On November 21, 2003, plaintiffs petitioned for permission to appeal the district court's interlocutory discovery order, arguing that the district court's interpretation of *McCoy* was erroneous. We granted plaintiffs' petition on January 15, 2004, and have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## ANALYSIS

¶ 14 Plaintiffs argue that the district court erred in interpreting the holding of *State ex rel. Office of Recovery Services v. McCoy*, 2000 UT 39, 999 P.2d 572. Contrary to the district court's interpretation, plaintiffs maintain that *McCoy* requires the State to pay its fair share of attorney fees in all instances where the State obtains its lien reimbursement from the proceeds of a settlement or judgment procured through the efforts of a Medicaid recipient's private attorney. Before we reach this issue, however, we must

address the preliminary arguments raised by the State. Specifically, the State contends that (1) we cannot address plaintiffs' claims because we lack subject matter jurisdiction to do so; and (2) assuming we have jurisdiction, we should nevertheless decline to further interpret *McCoy* because doing so would constitute an impermissible advisory opinion.

## I. SUBJECT MATTER JURISDICTION

¶ 15 The State contends that we lack subject matter jurisdiction over this case because plaintiffs failed to comply with the Immunity Act. Specifically, the State argues that plaintiffs' notice of claim was deficient because it did not list all of the Class II plaintiffs and did not include a specific request for attorney fees under section 26–19–7 of the Utah Code.

¶ 16 Before reaching the substance of the State's jurisdictional claim, we must determine whether that claim falls within the scope of this interlocutory appeal. Although it is generally true that the issue of subject matter jurisdiction "is a threshold issue," which can be raised at any time and must be addressed before the merits of other claims, *Hous. Auth. v. Snyder*, 2002 UT 28, ¶ 11, 44 P.3d 724, this is not the case in the context of an interlocutory appeal. On interlocutory appeal, we review only those specific issues presented in the petition. *See State v. Lusk*, 2001 UT 102, ¶ 32, 37 P.3d 1103 (refusing to address a question because it was "beyond the scope of review for which we granted Lusk's petition for this interlocutory appeal"). Thus, we are not compelled to review subject matter jurisdiction if that issue was neither included in the petition for interlocutory appeal nor the subject of a cross-petition. *See Mercury Mktg. Techs. of Del., Inc. v. State ex rel. Beebe*, No. 03–1382, 358 Ark. 319, —— S.W.3d ——, ——, 2004 WL 1475391, 2004 Ark. LEXIS 447, at *13–14 (Ark. July 1, 2004) (declining to address "whether the circuit court erred in finding that it had subject-matter jurisdiction over the action, because this went beyond the scope of the interlocutory appeal"). Nevertheless, because the issue of subject matter jurisdiction will always bear some relation-

ship to the interlocutory orders presented for review, we retain the discretion to address subject matter jurisdiction on interlocutory appeal in those cases where we deem it appropriate. Where we decline to do so, the parties may appeal the issue of subject matter jurisdiction once a final decision has been rendered, as mere denial of a petition for interlocutory appeal does not necessarily act as a judgment on the merits, *see Mountain States Tel. & Tel. Co. v. Atkin, Wright & Miles*, 681 P.2d 1258, 1263 (Utah 1984), and " 'challenges to subject matter jurisdiction ... cannot be waived,' " *Chen v. Stewart*, 2004 UT 82, ¶ 34, 100 P.3d 1177 (quoting *Barnard v. Wassermann*, 855 P.2d 243, 248 (Utah 1993)).

¶ 17 Because of the lengthy procedural history in this case, we believe that it is appropriate to address the issue of subject matter jurisdiction at this stage, even though it is not within the scope of the petition for interlocutory appeal. Accordingly, we exercise our discretion to review the issue of whether plaintiffs complied with the Immunity Act, thereby vesting the district court with subject matter jurisdiction over their claims against the State.

¶ 18 The Immunity Act, sections 63–30–1 to –38 of the Utah Code, "grants the state and its political subdivisions 'broad, background immunity' from injuries that result due to the exercise of a governmental function." *Wheeler v. McPherson*, 2002 UT 16, ¶ 10, 40 P.3d 632 (quoting *Hall v. State Dep't of Corr.*, 2001 UT 34, ¶ 18, 24 P.3d 958). The Act waives this immunity for certain claims and specifies the procedures that claimants must follow in order to maintain an action against the State or its political subdivisions. *See* Utah Code Ann. §§ 63–30–4 to –13 (1997). In *Wheeler*, we reasoned that, " '[w]here the government grants statutory rights of action against itself, any conditions

placed on those rights must be followed precisely.' " 2002 UT 16, ¶ 11, 40 P.3d 632 (quoting *Hall*, 2001 UT 34, ¶ 23, 24 P.3d 958). Accordingly, "[c]ompliance with the Immunity Act is a prerequisite to vesting a district court with subject matter jurisdiction over claims against governmental entities." *Id.* ¶ 9.

¶ 19 The State alleges two deficiencies in plaintiffs' notice of claim. First, the State contends that the notice failed to sufficiently articulate the claim for attorney fees that plaintiffs now seek. Second, the State contends that the notice was ineffective because it did not identify by name all of the plaintiffs to this action. Plaintiffs disagree, asserting that their notice was sufficient. Alternatively, plaintiffs argue that they were not required to comply with the notice of claim requirements because their claims are equitable in nature.[3] Because we conclude that plaintiffs' notice of claim satisfied the requirements of the Immunity Act, it is unnecessary for us to address whether plaintiffs' claims are, in actuality, equitable.

¶ 20 Section 63–30–11 of the Immunity Act provides that "[a]ny person having a claim for injury against a governmental entity ... shall file a written notice of claim with the entity before maintaining an action." Utah Code Ann. § 63–30–11(2). The notice must contain "(i) a brief statement of the facts; (ii) the nature of the claim asserted; and (iii) the damages incurred by the claimant so far as they are known." *Id.* § 63–30–11(3)(a). The purpose of the notice "is to 'provide[ ] the governmental entity an opportunity to correct the condition that caused the injury, evaluate the claim, and perhaps settle the matter without the expense of litigation.' " *Pigs Gun Club, Inc. v. Sanpete County*, 2002 UT 17, ¶ 10, 42 P.3d 379 (quoting *Larson v. Park City Mun. Corp.*, 955 P.2d 343, 345–46 (Utah 1998)) (alteration in

3. This court has recognized that equitable claims are not governed by the notice of claim provisions of the Immunity Act. For example, in *El Rancho Enterprises, Inc. v. Murray City Corp.*, 565 P.2d 778, 780 (Utah 1977), we noted that "an equitable claim may be brought without the necessity of first presenting a claim for damages." *See also Am. Tierra Corp. v. City of W. Jordan*, 840 P.2d 757, 760 (Utah 1992) (holding that equitable claims are "exempt from the filing requirements and time limits imposed by the ... Immunity Act"); *Jenkins v. Swan*, 675 P.2d 1145, 1154 (Utah 1983) ("[E]quitable claims ... are exempt from the notice requirements."). Thus, a plaintiff asserting an equitable claim is not bound by the notice requirements of the Immunity Act.

original). To ensure that this purpose is fulfilled, we have repeatedly required strict compliance with the notice of claim provisions. For example, in *Wheeler*, "we reiterate[d] ... that the Immunity Act demands *strict compliance* with its requirements to allow suit against governmental entities. The notice of claim provision, particularly, neither contemplates nor allows for anything less." 2002 UT 16, ¶ 13, 40 P.3d 632 (emphasis added).

¶ 21 Although we have mandated strict compliance with the notice of claim procedures, we have not required that such notices " 'meet the standards required to state a claim for relief.' " *Peeples v. State*, 2004 UT App 328, ¶ 11, 100 P.3d 254 (quoting *Behrens v. Raleigh Hills Hosp., Inc.*, 675 P.2d 1179, 1183 (Utah 1983)). Rather, a plaintiff need only include "enough specificity in the notice to inform as to the nature of the claim so that the defendant can appraise its potential liability." *Yearsley v. Jensen*, 798 P.2d 1127, 1129 (Utah 1990). Applying this standard, we conclude that plaintiffs' notice of claim satisfied the requirements of the Immunity Act with respect to both its description of the claims and its identification of the plaintiffs.

¶ 22 First, we conclude that plaintiffs satisfied the requirement to "set forth ... the nature of the claim asserted," Utah Code Ann. § 63–30–11(3)(a)(ii), thereby affording the State an opportunity "to appraise its potential liability," *Yearsley*, 798 P.2d at 1129. Plaintiffs attached a draft complaint to their notice. The draft included several statements that sufficiently communicated plaintiffs' claim for attorney fees. For example, the draft complaint requested "attorneys' fees as may be provided by law." Because plaintiffs seek recovery of attorney fees under section 26–19–7 of the Utah Code, they are seeking recovery of attorney fees "as may be provided by law." Additionally, although plaintiffs' draft complaint focused heavily on the issue of the lien statute's constitutionality, it also sought relief for "monies ... [that] were illegally and unlawfully taken." Because plaintiffs may be entitled to contribution from the State for attorney fees under section 26–19–7, any retention of those fees by the State would constitute "monies illegally and unlawfully taken."

¶ 23 Moreover, plaintiffs should not be penalized because their notice of claim failed to accurately predict future developments in the law. When plaintiffs filed their notice, the question of the lien statute's constitutionality had yet to be decided. Because plaintiffs were challenging the validity of the State's entire lien, it was unnecessary for them to also include a separate claim seeking recovery of only their attorney fees. The fact that this court subsequently upheld the lien statute's constitutionality should not bar plaintiffs' attempt to recover a portion of the funds they originally sought. We therefore conclude that plaintiffs' notice of claim was sufficient to communicate the nature of the claim they now assert.

¶ 24 We similarly conclude that plaintiffs' notice of claim was not deficient even though it did not expressly include the name of each potential Class II plaintiff. Relying on our holding in *Pigs Gun Club*, 2002 UT 17, 42 P.3d 379, the State asserts that a notice of claim must contain the name of each individual plaintiff. In *Pigs Gun Club*, we declared that "[section 63–30–11] itself clearly requires any person filing suit against a governmental agency to file a notice of claim. In other words, each plaintiff's name must be on the notice of claim." *Id.* ¶ 10 (citation omitted). Unlike this case, however, *Pigs Gun Club* was not a class action. That distinction is significant because interpreting the notice of claim provision to require identification of every potential plaintiff in a class action lawsuit would nullify our class action rule, which provides that "[o]ne or more members of a class may sue or be sued as *representative* parties on behalf of all." Utah R. Civ. P. 23(a) (emphasis added). Nothing in the Immunity Act suggests that the State declined to waive immunity from class action lawsuits. Accordingly, we hold that a claim providing notice of a possible class action lawsuit satisfies the requirements of the Immunity Act if it is filed by a class representative on behalf of potential class members. *Cf. Moreno v. Bd. of Educ.*, 926 P.2d 886, 892 (Utah 1996) (holding that the notice of claim filed by a

guardian in a wrongful death action, even though erroneously filed on the guardian's own behalf, was sufficient to preserve the parent's claim because the guardian was legally authorized to file a claim on behalf of the parent). The notice of claim in this case met that requirement. It was filed by the claimants "individually and ... as representative[s] of a class." Because plaintiffs' notice of claim complied with the requirements of the Immunity Act, we hold that we possess subject matter jurisdiction over their claims against the State.

## II. ADVISORY OPINION

¶ 25 Plaintiffs sought interlocutory review of the protective order entered by the district court. On appeal, however, plaintiffs do not restrict their arguments to the scope of the protective order. Rather, they assert that "a number of other questions have arisen regarding [our opinion in *McCoy*, 2000 UT 39] that should be resolved to avoid further appeals." The State contends that the district court correctly applied the *McCoy* decision when fashioning the protective order and that plaintiffs' request for additional guidance in interpreting *McCoy* calls for an impermissible advisory opinion.

▬▬ ¶ 26 We repeatedly have declined invitations to issue advisory opinions. In *State v. Ortiz*, 1999 UT 84, 987 P.2d 39, we declared:

> "This court will not issue advisory opinions or examine a controversy that has not yet sharpened into an actual or imminent clash of legal rights and obligations between the parties thereto. Where there exists no more than a difference of opinion regarding the hypothetical application of a piece of legislation to a situation in which the parties might, at some future time, find themselves, the question is unripe for adjudication."

*Id.* ¶ 3 (quoting *State v. Herrera*, 895 P.2d 359, 371 (Utah 1995) (further quotations omitted)); *see also Provo City Corp. v. Thompson*, 2004 UT 14, ¶ 22, 86 P.3d 735

("We have observed on many occasions that this court is not inclined to issue mere advisory opinions." (internal quotations omitted)). An opinion is not merely advisory, however, if it will, in fact, have a "meaningful effect" on the parties. *See Thompson*, 2004 UT 14, ¶ 22, 86 P.3d 735. The opinion we are asked to render in this case would have such an effect.

▬▬ ¶ 27 The scope of the protective order entered by the district court was dependent on its interpretation of *McCoy*. After limiting discovery to issues relevant to class certification, the district court defined the scope of permissible discovery, stating that "[p]laintiffs may thereby pursue the identification of recipients who fall within the holding of the *McCoy* case as construed by this Order." Clarifying the holding of *McCoy* will have the effect of either expanding or contracting the scope of discovery and will define the composition of the class. Thus, our opinion will have a "meaningful effect" on the parties.

¶ 28 Although we are obliged to decide whether the protective order was grounded upon the correct interpretation of *McCoy*, we agree with the State that plaintiffs have asked us to address other issues that do not bear upon the scope of the protective order.[4] Because it would be inappropriate for us to address all of the hypothetical "related questions" posed by plaintiffs, we will restrict our opinion to the appropriate scope of the protective order, addressing the related questions only to the extent that they have a bearing on the scope of that order. Indeed, it would be premature for us to opine as to plaintiffs' entitlement to attorney fees in all of the fact scenarios contemplated by their questions when discovery has yet to reveal whether those scenarios are even present in this case.

¶ 29 Before addressing the scope of the protective order, we pause to note that the apparent confusion in this area of the law and the number of situations unaddressed by

---

4. For example, plaintiffs ask us to opine as to whether the State's obligation to pay "its fair share of a recipient's attorney fees [is] dependent upon the degree of cooperation by the recipient." They further ask whether the State should be required to "pay a fair share of a recipient's attorney fees if it hires its own attorney."

the Medicaid lien statute cry out for legislative attention. This is especially so given the frequency with which this court has been confronted with disputes regarding application of the lien statute.

¶ 30 It is clear that the State has a legitimate and definite interest in obtaining reimbursement of funds paid to Medicaid recipients. This interest would appear to be furthered by a scheme in which private attorneys have an incentive to seek recoveries benefitting the State. However, without a definitive set of parameters defining the terms and conditions under which private attorneys will be compensated for their efforts, those attorneys will have little or no incentive to seek recoveries benefitting the State.[5] Consequently, the State, the Medicaid recipients, and the private attorneys who represent them would all benefit from definable rules and a clear expression of policy in this area.

¶ 31 The legislature, with its ability to "provide a forum for full discussion and consideration of the pros and cons of the problems involved, and to enact into law those policies which, in [its] judgment, will best serve the common welfare," *Stoker v. Stoker,* 616 P.2d 590, 592 (Utah 1980) (Crockett, C.J., dissenting), is the appropriate body to undertake this task. Furthermore, because the legislature, unlike this court, is not constrained to address a single case at a time, it is able to devise a comprehensive scheme, providing predictability and appropriate incentives to the State, the Medicaid recipients, and their private attorneys. We hope the legislature will do so.

### III. DID THE DISTRICT COURT ERRONEOUSLY INTERPRET *McCOY?*

Citing our holding in *McCoy,* the district court ruled that plaintiffs were entitled to

recover attorney fees from the State only in cases where "the State elects to recover directly from a recipient who has expressly excluded the State's claim from any attempt to recover from a third party." *State ex rel. Office of Recovery Servs. v. McCoy,* 2000 UT 39, ¶ 18, 999 P.2d 572. The protective order entered by the district court limited discovery accordingly. Plaintiffs contend that the district court's ruling on this issue was erroneous. Specifically, they assert that they are entitled to recover attorney fees from the State in any case where the State obtained a lien reimbursement through the efforts of a recipient's private attorney. The State counters that attorney fees may be recovered only in those cases where (1) the recipient requested consent, (2) the recipient excluded from his or her claim the amount of the State's lien, and (3) the State failed to seek reimbursement from the liable party and elected instead to obtain reimbursement directly from the Medicaid recipient.

¶ 32 Interpreting case law presents a question of law. *State ex rel. Office of Recovery Servs. v. Streight,* 2004 UT 88, ¶ 6, 108 P.3d 690. Accordingly, we review the district court's interpretation of our ruling in *McCoy* for correctness. *Id.*

¶ 33 Plaintiffs' entitlement to attorney fees in Medicaid lien cases is governed by section 26–19–7 of the Utah Code, which provides:

(1)(a) A recipient may not file a claim, commence an action, or settle, compromise, release, or waive a claim against a third party for recovery of medical costs for an injury, disease, or disability for which the department has provided or has become obligated to provide medical assistance, without the department's written consent.

. . . .

(4) The department may not pay more than 33% of its total recovery for attor-

---

**5.** The State argues persuasively that it should not be forced to pay fees to private attorneys for obtaining Medicaid reimbursement in those cases where the State could have secured the reimbursement itself with little or no effort. On the other hand, plaintiffs argue persuasively that the State often refuses to compensate the attorneys of Medicaid recipients in cases where the State's reimbursement is entirely attributable to the efforts of private attorneys and where the State would not otherwise have obtained a recovery. Plaintiffs assert that it is fundamentally unfair to allow the State a "free ride" in such situations and that the "free ride [will] be the last ride when attorneys discover there is no incentive to take a recipient's case if all proceeds are taken by the State."

ney's fees, but shall pay a proportionate share of the costs in an action that is commenced with the department's written consent.

Utah Code Ann. § 26–19–7(1), (4) (1998).

¶ 34 In *McCoy*, we were asked to consider whether the defendant, an attorney hired by a Medicaid recipient to recover damages for an injury he sustained in a slip and fall, was entitled to attorney fees from the State under section 26–19–7(4). 2000 UT 39, ¶¶ 2–3, 13, 999 P.2d 572. Before initiating any claim or suit against the liable third party, McCoy requested consent from the State to bring a claim on its behalf. *Id.* ¶ 3. The State refused. *Id.* Thereafter, McCoy filed a claim against the liable third party, expressly excluding the State's claim for the medical assistance it had provided. *Id.* ¶¶ 3–4. The liable third party agreed to settle the claim and paid the Medicaid recipient. *Id.* ¶ 5. The State then filed suit against McCoy to recover its lien from the settlement proceeds held in trust by McCoy. *Id.* ¶ 6. McCoy resisted, arguing that because he had excluded the State's claim, the State was not entitled to any proceeds that he obtained. *Id.* ¶ 11.

¶ 35 This court rejected McCoy's argument, holding that the Utah Medical Benefits Recovery Act, Utah Code Ann. §§ 26–19–1 to –19 (1998) (amended 2004), entitled the State to the proceeds and superseded any efforts by McCoy to insulate his client's recovery from the State's reach. *McCoy*, 2000 UT 39, ¶ 12, 999 P.2d 572. Thus, to the extent McCoy attempted to utilize his exclusion of the State's claim as a tactic to avoid satisfying the State's lien, this court rejected that tactic. We did, however, allow McCoy to recover a proportionate share of his attorney fees from the State, reasoning that McCoy had "followed the requirements of the Act" by asking for the State's consent. *Id.* ¶ 18.

¶ 36 The State asserts that the district court was correct in limiting the holding of *McCoy* to the last sentence of the eighteenth paragraph, where we declared:

We therefore conclude that under subsection (4), *when the State elects to recover directly from a recipient who has expressly excluded the State's claim from any*

*attempt to recover from a third party*, the State must pay the attorney fees incurred in procuring the State's share of the settlement proceeds.

*Id.* (emphasis added).

¶ 37 Contrary to the State's assertion, this language does not constitute *McCoy's* holding of general application. When read in the context of the opinion as a whole, it is apparent that this language constitutes only the *ruling*, or the application of the general holding to the specific facts of the case. *See Black's Law Dictionary* 1334 (7th ed.1999) (noting that "[I]n common usage 'legal ruling' ... is a term ordinarily used to signify the outcome of applying a legal test when that outcome is one of relatively narrow impact. The immediate effect is to decide an issue in a single case." (internal quotations omitted)). We acknowledged as much in *McCoy*, in the sentences immediately preceding the passage now cited by the State as the "holding," when we stated:

We see no justification for so limiting the relatively broad reach of subsection (4) *in the case before us*. In fact, it would be inherently unfair not to award attorney fees to McCoy, who has followed the requirements of the Act in securing a recovery on behalf of his client. We therefore conclude that under subsection (4), when the State elects to recover directly from a recipient who has expressly excluded the State's claim from any attempt to recover from a third party, the State must pay the attorney fees incurred in procuring the State's share of the settlement proceeds.

*Id.* (emphasis added). In short, our specific ruling in *McCoy* was based on the fact that the State sought to recover its lien directly from the recipient after McCoy had requested, and was denied, consent and after the recipient had excluded the State's claim from his efforts to obtain a recovery. *Id.* ¶¶ 3, 6.

¶ 38 In this case, we are asked to clarify the holding of *McCoy* as it relates to the scope of a discovery order concerning potential class members. Under such a circumstance, there is no need to restrict discovery to the class of cases that present fact patterns identical to the one presented in

*McCoy.* In a context where few, if any, facts have been developed, it is necessary to reach beyond the narrow, fact-specific ruling of *McCoy* and apply its broader, more general holding. Doing otherwise would artificially and illogically restrict discovery and, concomitantly, the size of the potential class. Until the facts surrounding the claims of each potential class member have been developed, it will be impossible for the court to assess whether they fall within the general holding of *McCoy.*

¶ 39 In an effort to define the appropriate scope of the protective order, we return to the underpinnings of our decision in *McCoy.* In *McCoy,* we concluded that the State was obligated to pay a proportionate share of the plaintiff's attorney fees because the plaintiff complied with section 26–19–7 of the Medicaid lien statute. *Id.* ¶ 18. We based this conclusion on the fact that McCoy had requested consent to pursue the State's claim.

¶ 40 Our reliance on this factor was mandated by the terms of the lien statute, which prohibits a Medicaid recipient from seeking recovery of funds advanced by the State without the State's written consent. Utah Code Ann. § 26–19–7. Where Medicaid recipients failed to comply with the statute, they were not entitled to a contribution from the State for their attorney fees. The lien statute fails to address, however, the State's obligation to pay its fair share of attorney fees in those cases where consent was requested from, but denied by, the State and the State nevertheless elects to obtain its recovery from the proceeds obtained through the efforts of a Medicaid recipient's attorney. Accordingly,

> [i]n *McCoy,* on grounds of fairness, we interpreted the statute to imply an obligation on the part of the State to pay fees where the attorney acted in compliance with the statute, requesting consent to pursue an action and then preserving the State's independent right to recover by excluding the State's claim from any action filed on behalf of the injured party.

*Streight,* 2004 UT 88, ¶ 13, 108 P.3d 690. This holding "struck a balance between the State's interest in protecting itself from collusive efforts to place otherwise reimbursable funds beyond its reach and the interest of private attorneys in being compensated for obtaining recoveries benefitting the State." *Id.*

¶ 41 The question left open by our decision in *McCoy,* and our subsequent decision in *Streight,* is whether the State's obligation to pay its fair share of attorney fees is limited to cases exactly like *McCoy,* where the recipient expressly excluded the State's claim and the State recovered its lien directly from the proceeds paid to the Medicaid recipient. In its effort to limit its obligation to such cases, the State relies on language from *McCoy* suggesting that the State is not obligated to pay attorney fees if it elects to recover its lien directly from the liable third party. *See McCoy,* 2000 UT 39, ¶¶ 18–19, 999 P.2d 572. In so arguing, however, the State overemphasizes the particular language at the expense of the underlying principle.

¶ 42 In *McCoy,* we noted that, "[h]aving elected not to recover directly from the third party ..., the State not only incurred a responsibility to pay attorney fees, but also effectively reduced [the recipient's] net recovery." *Id.* ¶ 18 n. 5. The phrase "recover directly from the third party" was used to identify those cases where the State recovered its lien independent of the recipient's settlement and thereby did not reduce the amount recovered by the recipient. That language was not intended to encompass situations in which the State's lien was paid directly from the settlement proceeds obtained through the efforts of the recipient's attorney. After refusing to consent to representation by the recipient's attorney, the State should not be free to recover its lien from the settlement or judgment obtained through the efforts of the recipient's attorney without incurring the obligation to pay its fair share of attorney fees.

¶ 43 Moreover, the State's obligation for fees should not be dependent upon whether the State obtained its reimbursement directly from the Medicaid recipient or whether it was able to arrange for payment directly from the liable third party. Permitting the State to circumvent any obligation for attorney fees by arranging for payment directly from a liable third party, even though the

settlement or judgment from which the lien is paid was procured through the efforts of the recipient's attorney, would sanction the State's abrogation of its responsibility to recover its lien "by relying on Medicaid recipients to act, usually unwittingly, on the State's behalf." *Streight*, 2004 UT 88, ¶ 21, 108 P.3d 690 (Durham, C.J., dissenting). Such a result would defeat the equitable basis for our ruling in *McCoy*. *See id.* ¶ 13 (majority opinion).

¶ 44 Additionally, relieving the State of its obligation to pay its fair share of attorney fees simply because the Medicaid recipient failed to expressly exclude the State's claim would similarly defeat the equitable basis of our ruling in *McCoy*. In fact, the Medical Benefits Recovery Act does not impose an express exclusion requirement on those who wish to proceed with their own claims after the State has denied them permission to press the State's claim on its behalf. The Act provides:

> A recipient may not file a claim, commence an action, or settle, compromise, release, or waive a claim against a third party for recovery of medical costs for an injury, disease, or disability for which the department has provided or has become obligated to provide medical assistance, without the department's written consent.

Utah Code Ann. § 26–19–7(1)(a).

■ ¶ 45 Read in isolation, this language might conceivably be understood to imply an express exclusion requirement on the basis that such an exclusion would be necessary to preserve the State's claim. Significantly, however, this section of the Act further states that, "[i]f the recipient proceeds without the department's written consent as required by Subsection (1)(a), the department *is not bound by any decision, judgment, agreement, or compromise rendered or made* on the claim or in the action," *id.* § 26–19–7(2)(a) (emphasis added), and that "[t]he department ... *retains its right to commence an independent action against the third party*," *id.* § 26–19–7(2)(b) (emphasis added). The Act thus contemplates that a Medicaid recipient may proceed with an independent action in cases where the State denies consent to include the State's claim. However,

the Act imposes no express obligation on the Medicaid recipient to expressly exclude the State's claim in such cases. Instead, section 26–19–7 itself, by its plain language, serves to preserve the State's claim against a third party *whether or not* the Medicaid recipient expressly excludes the State's claim from his own action or negotiations, putting the third party on notice that, in the absence of the State's written consent, the State will not be bound by any representations made by a Medicaid recipient as to whether the State's claim is included, nor will the State be bound by any release of claims signed by a Medicaid recipient.

■ ¶ 46 We do not interpret this court's opinion in *McCoy* as mandating a contrary conclusion. The language in *McCoy* that might be read to suggest that the express exclusion is necessary to preserve the State's claim appears in a footnote, which refutes the State's argument that McCoy was not entitled to attorney fees because he failed to cooperate with the State. 2000 UT 39, ¶ 18 n. 4, 999 P.2d 572. Had we recognized in that footnote that the State's claim was preserved regardless of McCoy's express exclusion, our conclusion would have been the same. In *McCoy*, this court stressed that "it would be inherently unfair not to award attorney fees to McCoy" where he had not only requested and been denied the State's consent, but had also taken the additional step of excluding the State's claim. *Id.* ¶ 18. As we have explained, however, this exclusion was entirely unnecessary to preserve the State's claim, and principles of fairness thus demand that the State pay its share of attorney fees whether or not the Medicaid recipient's attorney expressly excludes the State's claim. Indeed, we noted in *McCoy* that the express exclusion itself leads to an unfair result whenever the State chooses, as it may, to recover its paid expenses from the proceeds gained through the efforts of the Medicaid recipient's attorney rather than through its own independent action. In such a situation, the State receives the money to which it is entitled, but the Medicaid recipient's net recovery is effectively reduced by that amount, and the liable third party entirely escapes responsibility for what it should have paid to

the State. *See id.* ¶ 18 n. 5; *id.* ¶ 22 (Durham, J., concurring).

¶ 47 In *Streight,* 2004 UT 88, 108 P.3d 690, this court distinguished the facts of the case before it from the facts in *McCoy,* partly on the basis that the attorney for Streight, unlike McCoy, had not expressly excluded the State's claim from the action that he filed. *See id.* ¶¶ 10, 13. However, the court's concern in *Streight,* more broadly described, was that an attorney has "[complied with the Act by] request[ing] consent and has done nothing to prejudice the State's right to recover its Medicaid payments." *Id.* ¶ 9. To date, this court has yet to analyze whether a Medicaid recipient's failure to expressly exclude the State's claim necessarily prejudices the State's right to recover. We now do so and conclude that it does not.

¶ 48 The statutory scheme enacted by the legislature grants the State maximum flexibility in recovering its Medicaid expenses. It allows the State to

> (1) take action directly against the third party, for which the State pays its own expenses; (2) grant consent to recipients seeking to pursue the State's claim, whereby the State's recovery will be reduced by reasonable attorney fees and, if any, its proportionate share of the costs of an action; or (3) refuse consent and proceed against the recipient after the recipient recovers from the third party, in which case the State's recovery shall be reduced by reasonable attorney fees.

*McCoy,* 2000 UT 39, ¶ 19, 999 P.2d 572. Because the State's flexibility is in no way reduced by a Medicaid recipient's failure to expressly exclude the State's claims from his own negotiations or complaint, there is no justification for requiring express exclusion as a prerequisite to the State's obligation to pay its share of attorney fees. Indeed, imposing such a requirement would serve only to benefit a liable third party at the expense of the Medicaid recipient. We accordingly hold that the State's obligation to pay its share of attorney fees is not dependent upon whether the recipient expressly excluded the State's claim but, rather, is dependent upon whether the recipient requested consent and

whether the State's recovery was attributable to the efforts of the recipient's attorney.

¶ 49 Accordingly, in all cases where the State satisfies its lien from proceeds procured through the efforts of a private attorney, the State is responsible for its proportionate share of attorney fees if the recipient or his attorney requested consent from the State. This is so regardless of whether the State satisfies its lien from funds recovered by the recipient or whether it recovers directly from a liable third party. Moreover, in those cases where a settlement or judgment is obtained through the efforts of a private attorney, any claim by the State that it recovered its lien through its own efforts will be subject to scrutiny. The State will not be able to establish that it recovered its lien through its own efforts simply by showing that it sent notification of its lien to potentially liable third parties with the expectation that they will pay the State directly from the settlement proceeds generated through the efforts of a recipient's private attorney. To avoid paying its fair share of attorney fees after it has refused to grant consent, the State must demonstrate that its lien was paid wholly independent of the settlement or judgment procured by the recipient's private attorney.

## IV. SCOPE OF DISCOVERY ORDER

¶ 50 We now turn to the scope of the discovery order. The district court limited discovery to that which "relates solely to the class issues" and authorized plaintiffs to "pursue the identification of recipients who fall within the holding of the *McCoy* case." Because the district court adopted an erroneously narrow view of our holding in *McCoy,* it necessarily follows that it unduly restricted the scope of discovery. We accordingly remand this case to the district court with instructions to modify the scope of the discovery order consistent with this opinion.

## CONCLUSION

¶ 51 The district court erred in limiting *McCoy* to its narrow, fact-specific ruling. Under the general holding of *McCoy,* the State is obligated to pay its share of a recipient's private attorney fees if either (1) the

State consents to the recipient's request to represent its interest; or (2) the State satisfies its lien from proceeds procured through the efforts of a recipient's private attorney in those cases where the recipient requested, but was denied, consent. We remand the case to the district court with instructions to modify the scope of the discovery order accordingly.

¶ 52 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Judge ORME concur in Justice PARRISH's opinion.

¶ 53 Having disqualified himself, Justice NEHRING does not participate herein; Court of Appeals Judge GREGORY K. ORME sat.